IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
4:13-CV-221-FL

VICTORIA MOORE WINSTON,               )
                                      )
        Plaintiff,                    )
                                      )        **MEMORANDUM AND**
        v.                            )        **RECOMMENDATION**
                                      )
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
        Defendant.                    )


In this action, plaintiff Victoria Moore Winston ("plaintiff" or, in context, "the claimant")

challenges the final decision of defendant Acting Commissioner of Social Security Carolyn W.

Colvin ("Commissioner") denying her application for a period of disability and disability

insurance benefits ("DIB") and supplemental security income ("SSI") on the grounds that she is

not disabled.[1]  The case is before the court on the respective parties' motions for judgment on the

pleadings.  (D.E. 30, 34).  Each party filed a memorandum in support of its motion (D.E. 31, 35).

The motions were referred to the undersigned Magistrate Judge for a memorandum and

recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  (*See* Public D.E. dated 2 July 2014).  For

the reasons set forth below, it will be recommended that the Commissioner's motion be allowed,

plaintiff's motion be denied, and the Commissioner's final decision be affirmed.

---

[1] The statutes and regulations applicable to disability determinations for DIB and SSI are in most respects the same.
The provisions relating to DIB are found in 42 U.S.C. subch. II, §§ 401, *et seq.* and 20 C.F.R. pt. 404, and those
relating to SSI in 42 U.S.C. subch. XVI, §§ 1381, *et seq.* and 20 C.F.R. pt. 416.

# BACKGROUND

## I.    CASE HISTORY

Plaintiff filed applications for DIB and SSI on 15 September 2006, alleging a disability onset date of 28 July 2006.   Transcript of Proceedings ("Tr.") 13.   On 10 July 2009, an Administrative Law Judge ("ALJ") issued a decision (Tr. 13-24) denying the applications. Plaintiff sought judicial review of the decision, and, on 17 September 2013, this court remanded the case to the Commissioner for further proceedings to address plaintiff's obesity in accordance with Soc. Sec. Ruling 02-1p, 2000 WL 628049 (12 Sep. 2012).   *Winston v. Astrue*, No. 4:11-CV-107-D, 2012 WL 4086448, at *5 (E.D.N.C. 17 Sept. 2012).   In response to the court's order, the Appeals Council remanded the case[2] to an administrative law judge ("ALJ") for further proceedings consistent with the court's order, including, if needed, a new hearing and supplemental evidence from a vocational expert.   Tr. 1053, 1055.   In addition to consideration of plaintiff's obesity, the Appeals Council directed the ALJ to address several other issues.[3]   Tr. 1054-55.

---

[2] The Appeals Council also consolidated the case with another one in which plaintiff had been denied benefits.  *See* Tr. 1053-54 (26 Nov. 2012 Appeals Council order); 1081-93 (21 Nov. 2011 ALJ dec. in consol. case).

[3] The ALJ's decision on remand, which is the subject of the instant appeal, summarized the Appeals Council's instructions as follows:

> In its order, the Appeals Council directed the undersigned to address the claimant's obesity, the nature and severity of her hemangioma, as well as her other impairments and their impact on her functioning for all relevant times, and to also give appropriate consideration to [an ALJ earlier decision denying benefits] from July 28, 2006 [Tr. 73-79], in accordance with AR 00-1(4). Additionally, the undersigned was directed to re-evaluate the opinion of Dr. Solovieff and obtain supplemental evidence from a vocational expert, with identification and resolution of any conflicts between their testimony and the Dictionary of Occupational Titles and its companion publication, the Selected Characteristics of Occupations (Ex. 8A).

> In compliance with this, the undersigned was directed to offer the claimant a new hearing and take [any] further needed action.

Tr. 933-34.

On 25 March 2013, a new hearing was held before an ALJ, at which plaintiff and a vocational expert testified. Tr. 966-1010. In a written decision dated 2 August 2013, the ALJ found that plaintiff was not disabled and therefore not entitled to DIB or SSI. Tr. 933-55. Plaintiff did not request review by the Appeals Council and commenced this proceeding for judicial review on 11 October 2013, pursuant to 42 U.S.C. §§ 405(g) (DIB) and 1383(c)(3) (SSI). (*See In Forma Pauperis* Mot. (D.E. 1); Order Allowing Mot. (D.E. 5); Compl. (D.E. 6)).

## II. STANDARDS FOR DISABILITY

The Social Security Act ("Act") defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 42 U.S.C. § 1382c(a)(3)(A); *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see* 42 U.S.C. § 1382c(a)(3)(B). The Act defines a physical or mental impairment as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The disability regulations under the Act ("Regulations") provide a five-step analysis that the ALJ must follow when determining whether a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

3

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in [§ 404.1509 for DIB and § 416.909 for SSI], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in [20 C.F.R. pt. 404, subpt. P, app. 1] ["listings"] . . . and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity ["RFC"] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . . .

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The burden of proof and production rests with the claimant during the first four steps of the analysis. *Pass*, 65 F.3d at 1203. The burden shifts to the Commissioner at the fifth step to show that alternative work is available for the claimant in the national economy. *Id.*

In the case of multiple impairments, the Regulations require that the ALJ "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. §§ 404.1523, 416.923. If a medically severe combination of impairments is found, the combined impact of those impairments will be considered throughout the disability determination process. *Id.*

## III. FINDINGS OF THE ALJ

Plaintiff was 41 years old on the alleged onset date of disability and 47 years old on the date of the administrative hearing. Tr. 953 ¶ 7; 971. The ALJ found that she has a limited

education (Tr. 953 ¶ 8) and past relevant work as a home health aide, nurse assistant, cashier, and dietary aide (Tr. 941 ¶ 5).

Applying the five-step analysis of 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since her alleged onset of disability. Tr. 936 ¶ 2. At step two, the ALJ found that plaintiff had the following medically determinable impairments that were severe within the meaning of the Regulations: obesity; degenerative disc disease/sciatica/arthritis; hemangioma; hypertension; borderline intellectual functioning; depression; anxiety/PTSD; mood disorder; chronic pain syndrome; sleep apnea; cervical disc disease; headaches; cardiomegaly; right leg pain of unknown etiology; bladder dysfunction; retroperitoneal lesion of the left kidney; and history of gastric ulcers. Tr. 936 ¶ 3. At step three, the ALJ found that plaintiff's impairments did not meet or medically equal any of the Listings. Tr. 936-37 ¶ 4.

The ALJ next determined that plaintiff had the RFC to perform light work—that is, to lift and carry up to 20 pounds occasionally and 10 pounds frequently, and to stand, walk, and sit for 6 hours in an 8-hour day. Tr. 940 ¶ 5; *see* 20 C.F.R. §§ 404.1567(b), 416.967(b). [4] He further found that plaintiff was subject to the following limitations:

> [S]he requires a sit/stand option (provided she would not have to change positions more often than twice per hour); she would be further limited to occasional climbing of ramps and stairs, but no climbing ladders, ropes, or scaffolds; she could occasionally balance, stoop, kneel, crouch, and/or crawl; she must avoid concentrated exposure to workplace hazards, such as dangerous moving machinery and unprotected heights; she is capable of performing simple, routine, repetitive tasks; she can maintain attention, concentration, persistence, or pace to stay on task for 2 hours at a time throughout a typical 8-hour workday, as required to perform such tasks; she requires a low stress work setting, which is further defined as a work setting that is non-production pace or quota based, rather a

---

[4] *See also Dictionary of Occupational Titles* (U.S. Dep't of Labor 4th ed. rev. 1991) ("DOT"), app. C § IV, def. of "L-Light Work," http://www.oalj.dol.gov/libdot htm (last visited 12 Jan. 2015). "Light work" and the other terms for exertional level as used in the Regulations have the same meaning as in the DOT. *See* 20 C.F.R. §§ 404.1567, 416.967.

goal-oriented job primarily dealing with things as opposed to people, with no more than occasional changes in the work setting and no more than occasional decision-making as a component of the job; she could perform no work with the public, such as sales or negotiations, though incidental or causal contact with the general public as . . . might arise in the course of a workday is not precluded; and she is limited to occasional social interaction with co-workers and supervisors.

Tr. 940 ¶ 5.

Based on his determination of plaintiff's RFC, the ALJ found at step four that plaintiff was not capable of performing her past relevant work.  Tr. 953 ¶ 6.  At step five, the ALJ accepted the testimony of the vocational expert and found that there were jobs in the national economy existing in significant numbers that plaintiff could perform, including jobs in the occupations of small parts assembler, electronics worker, and checker.  Tr. 954 ¶ 10.  The ALJ accordingly concluded that plaintiff was not disabled.  Tr. 955 ¶ 11.

## IV.    STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), judicial review of the final decision of the Commissioner is limited to considering whether the Commissioner's decision is supported by substantial evidence in the record and whether the appropriate legal standards were applied.  *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Unless the court finds that the Commissioner's decision is not supported by substantial evidence or that the wrong legal standard was applied, the Commissioner's decision must be upheld.  *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  It is more than a scintilla of evidence, but somewhat less than a preponderance.  *Perales*, 402 U.S. at 401.

The court may not substitute its judgment for that of the Commissioner as long as the decision is supported by substantial evidence. *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). In addition, the court may not make findings of fact, revisit inconsistent evidence, or make determinations of credibility. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979). A Commissioner's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion. *Blalock*, 483 F.2d at 775.

Before a court can determine whether a decision is supported by substantial evidence, it must ascertain whether the Commissioner has considered all relevant evidence and sufficiently explained the weight given to probative evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

## DISCUSSION

## I.    OVERVIEW OF PLAINTIFF'S CONTENTIONS

Plaintiff contends that the ALJ erred by: (1) failing to properly weigh the medical opinion evidence; (2) failing to properly consider a 25 October 2007 decision by the North Carolina Department of Health and Human Services ("NCDHHS") (Tr. 197-98) finding that plaintiff was disabled for the purposes of Medicaid ("Medicaid decision"); and (3) erroneously finding that she did not meet Listings 12.04 (affective disorders) and 12.06 (anxiety related disorders). The court will address each contention separately.

## II. THE ALJ'S CONSIDERATION OF THE MEDICAL OPINION EVIDENCE

Plaintiff contends that the ALJ erred by not giving sufficient weight to the medical opinions of treating physician Jennifer Roberson, M.D., treating physician Frances E. Williams, M.D., examining state agency consulting physician Gary Solovieff, M.D., treating psychologist Jean S. Huryn, Ph.D., and examining state agency consulting psychologist Gerald A. Strag, Ed.D. The court finds no error.

### A. Applicable Legal Standards

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). An ALJ must consider all medical opinions in a case in determining whether a claimant is disabled. *See id.* §§ 404.1527(c), 416.927(c); *Nicholson v. Comm'r of Soc. Sec. Admin.*, 600 F. Supp. 2d 740, 752 (N.D. W. Va. 2009) ("Pursuant to 20 C.F.R. §§ 404.1527(b), 416.927(b), an ALJ must consider all medical opinions when determining the disability status of a claimant."). The Regulations provide that opinions of treating physicians and psychologists on the nature and severity of impairments are to be accorded controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Craig*, 76 F.3d at 590; *Ward v. Chater*, 924 F. Supp. 53, 55-56 (W.D. Va. 1996); Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *2 (2 July 1996). Otherwise, the opinions are to be given significantly less weight. *Craig*, 76 F.3d at 590.

The ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *5; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Ashmore v. Colvin*, No. 0:11-2865-TMC, 2013 WL 837643, at *2 (D.S.C. 6 Mar. 2013) ("In doing so [*i.e.*, giving less weight to the opinion of a treating physician], the ALJ must explain what weight is given to a treating physician's opinion and give specific reasons for his decision to discount the opinion.").

The Regulations further require the ALJ to consider the opinions of any state agency medical or psychological non-examining consultants. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). The weight ultimately attributed to medical opinions of non-examining sources depends on the same factors, to the extent applicable, used to evaluate the medical opinions of treating sources. 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). Significantly, "[u]nless a treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant . . . ." *Id*; *see also* Soc. Sec. Ruling 96-6p, 1996 WL 374180, at *2 (stating that ALJs "may not ignore these opinions and must explain the weight given to these opinions in their decisions").

### B.     Medical Opinion of Dr. Roberson

Plaintiff contends that the ALJ improperly gave "little" weight (*see* Tr. 948, 949) to two opinions of plaintiff's primary care physician, Dr. Roberson, who treated plaintiff from March 2009 to January 2013 (*see* Tr. 863-77, 1227-53, 1300-41, 1558-89, 1653-1714). The first of these opinions is a letter dated 17 May 2009 in which Dr. Roberson states that plaintiff has neck pain and chronic back pain that was "unlikely to improve," which renders her "unable to sit or

stand for any extended period of time" or "to bend, lift, push or pull in any capacity." Tr. 908. Dr. Roberson further states that plaintiff requires the use of a cane to walk. Tr. 908. In support of her opinion, Dr. Roberson cites plaintiff's previous diagnosis of "disc herniation in the cervical and lumbar spine"; physical examinations consistently indicating tenderness of her back and neck; and her daily use of pain medication for pain relief. Tr. 908.

Plaintiff asserts that the ALJ erroneously reduced the weight he awarded this opinion on the grounds that it was based, in part, on plaintiff's subjective complaints. (*See* Plf.'s Mem. 16-17 ("[T]he ALJ's rejection of medical opinion evidence which relies, to some degree, on subjective statements of the patient solely because of the subjective nature of the complaints is in error.")). It is correct, as plaintiff contends, that "[a] party seeking benefits need not provide objective medical evidence to corroborate his allegations of pain." *Hall v. Astrue*, No. 2:11-CV-22-D, 2012 WL 3727317, at *2 (E.D.N.C. 28 Aug. 2012). "However, an ALJ may discredit a party's allegations of pain to the extent the allegations are inconsistent with (1) objective medical evidence of the underlying impairment or (2) the pain reasonably expected to be caused by the underlying impairment." *Id.* (citing *Hines v. Barnhart*, 453 F.3d 559, 565 n.3 (4th Cir. 2006); *Craig*, 76 F.3d at 595).

Here, it is clear from the ALJ's discussion of this opinion that he afforded it less weight because it was unsupported by, and even inconsistent with, the objective medical evidence of record. He explained in detail as follows:

> Little weight is also given to the opinions expressed by Dr. Roberson, who appeared to base her opinions that the claimant's chronic back [pain] prevents her from working on the claimant's subjective reports, and not upon objective findings as shown throughout the record. While the claimant may have some pain, MRIs of the cervical spine have been relatively normal. They show only mild degenerative changes of the discs without spinal stenosis or exit foraminal stenosis (Ex. 40F). Furthermore, MRIs of the lumbar spine were for the most part normal. MRIs showed only mild degenerative changes. The claimant had only

minimal tenderness along the right upper back but had full range of motion of her knees with no significant pain on extremes and deep tendon reflexes were intact (Ex. l8F). Additionally, EMG studies, performed because of her back complaints, were essentially normal (Ex. 21F). Although the record indicates that the claimant uses a cane for support because she felt that her back might give out, there is no indication that cane is medically necessary. Dr. Roberson stated that the claimant requires the use of cane in order to walk. However, this has not been supported throughout the medical record. She had full range of motion of the left knee with no significant . . . pain on extremes. She had only minimal tenderness. X-rays of the right knee showed no gross abnormality (Ex. 31F).

Tr. 948.

Substantial evidence supports the reasons cited by the ALJ, including the evidence he discusses. Of particular significance is that while Dr. Roberson cited a purported previous diagnosis of "disc herniation in the cervical and lumbar spine" (Tr. 908) in support of her opinion, the record contains no evidence of such a diagnosis. Rather, it appears that Dr. Roberson was relying solely on plaintiff's own report of this diagnosis. *See, e.g.,* Tr. 1663 (Dr. Roberson noting plaintiff's description of a "history of chronic back pain and herniated disc"). Plaintiff also regularly reported this diagnosis as part of her medical history to other providers and examiners. *See, e.g.,* Tr. 275, 660, 696, 712, 715, 725, 728, 733, 740, 756, 814, 817, 821, 840, 842, 845, 889, 915, 1346, 1377, 1389, 1392, 1402, 1405, 1435, 1440, 1455, 1459, 1462, 1466, 1469, 1472, 1492.

One such report was made on 14 March 2007 to J. Kirk Dickie, M.D., who treated plaintiff for back pain. Tr. 639. Plaintiff told Dr. Dickie that "[s]he had an MRI done 2 weeks ago that showed a herniated disc." Tr. 639. Plaintiff appears to be referencing the MRI of her lumbar spine performed on 20 February 2007. Tr. 536. However, the radiology report for this MRI indicates only "[m]inimal to mild disc bulging of the lower lumbar spine *without evidence of disc herniation*, central spinal stenosis, or neuroforaminal stenosis." Tr. 536 (emphasis added). Further, as explained by the ALJ, all other radiological and neurological studies of

plaintiff's cervical and lumbar spine were either normal or showed only mild degenerative changes. *See*, *e.g.,* Tr. 400 (May 2002 lumbar x-ray revealing "vertebral bodies well aligned without significant vertebral compression or disc space reduction"); Tr. 300 (Apr. 2005 x-ray of lumbar, coccyx, sacral, and pelvic regions all negative); Tr. 290 (May 2005 x-ray of lumbosacral spine showing mild degenerative changes); Tr. 315 (Feb. 2006 x-ray of lumbar spine showing no signs of acute bony injury, soft tissue deformity, or significant degenerative changes); Tr. 485 (Mar. 2006 MRI of the lumbar spine showing no evidence of disc herniation or stenosis); Tr. 308 (May 2006 EMG nerve conduction study yielding "unremarkable" results); Tr. 909 (Feb. 2009 MRI showing lumbar spine was normal); Tr. 910 (Feb. 2009 MRI of cervical spine showing "mild" degenerative changes of the discs without spinal stenosis or exit foraminal stenosis); Tr. 1465 (May 2009 CT scan showing no evidence of either large lumbar herniation or foraminal narrowing, and an age-appropriate CT of the lumbar spine); Tr. 1413 (Sept. 2009 x-ray of chest showing "mild degenerative changes along the thoracic spine"); Tr. 1396 (Nov. 2009 CT scan of neck indicating a small nodule thought to be a sebaceous cyst or small node); Tr. 1534, 1536 (Mar. 2010 x-ray of the lumbar spine showing mild degenerative changes in the lumbar spine). Because Dr. Roberson's opinion was based, in part, on a medical diagnosis unsupported by the objective medical evidence, the ALJ did not err in awarding the opinion less than controlling weight. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Dr. Roberson's second opinion, dated 9 August 2010, consists of a medical source statement form completed by hand (Tr. 1640-41) in which she found that, as stated by the ALJ,

> the claimant could work no hours per day, could only stand 30 minutes at a time, could stand a total of 2 hours in a workday, could sit for 30 minutes at a time, could sit for a total of 2 hours in a workday, could only occasionally lift 5 pounds, and could lift nothing on a frequent basis. She also opined other postural, manipulative, and environmental limitations, and she opined that the claimant suffered from severe pain. She concluded the claimant's pain and back condition

were chronic, permanent, and unlikely to improve and that she required the use of sedating medication (Ex. 65F).

Tr. 949.

The ALJ explained that he assigned little weight to this opinion because it was "not consistent with the claimant's activities of daily living." Tr. 949. He elaborated on this determination as follows:

> For instance, Dr. Roberson wrote that the limitations on the claimant had applied since 2000, but testimony and other evidence shows the claimant has since been still able to cook, clean, drive, and go grocery shopping (Ex. 15E, 16E). Also, the current record shows that the claimant can walk approximately a quarter of a mile and that she can dress herself (Ex. 52F, 55F). The totality of the evidence, some of which has been discussed herein, truly does not support the set of limitations described by Dr. Roberson, even though her statements might have been offered with the best of intentions.

Tr. 949.

Plaintiff asserts that the evidence cited by the ALJ does not support his determination that plaintiff's activities of daily living are less limited than Dr. Roberson found. Specifically, plaintiff asserts that the January 2010 statements by plaintiff (Tr. 1191 (Ex. 16E)) and her daughter (Tr. 1190 (Ex. 15E)) regarding her limitations ("reports of contact") referenced by the ALJ, do not support his conclusion that she is capable of cooking, cleaning, driving, and grocery shopping. The court agrees that these statements do indicate that plaintiff has some difficulty with these activities. For example, regarding plaintiff's ability to drive, plaintiff's daughter stated that plaintiff was able to drive only short distances due to pain. Tr. 1190.

However, these reports of contact are not the only evidence relied upon by the ALJ in making his determination regarding plaintiff's activities of daily living. The ALJ also cites to plaintiff's 15 February 2010 statement to state psychological examining consultant, Dr. Strag, that she had "walked approximately a quarter of a mile from a drop-off point to [his] office." Tr.

1346. Other evidence in the record further supports the ALJ's determination. In 2009, plaintiff testified that she had a driver's license and drove herself to the hearing. Tr. 53. She also testified that she was sometimes able to cook and clean the house and that she was able to shop for her own groceries. Tr. 56. The court concludes that substantial evidence supports the ALJ's determination that plaintiff's activities of daily living were not consistent with the limitations found by Dr. Roberson.

Further, Dr. Roberson's opinion indicates that the limitations she found applied for an "indefinite" period which began in 2000. Tr. 1641. As noted by the Commissioner, such a finding is clearly inconsistent with the evidence given that plaintiff was actually employed from 2000 until 2006, the year she alleges she became disabled. *See, e.g.*, Tr. 188, 191-92, 972-75, 1015. Indeed, plaintiff's own report to Dr. Solovieff during his March 2010 physical examination was that her back pain limiting her ability to work began only around 2005. Tr. 1525. This inconsistency, alone, constitutes a sufficient basis for the ALJ's reduction in the weight accorded Dr. Roberson's opinion. The ALJ's assessment of Dr. Roberson's opinion was proper.

### C. Medical Opinion of Dr. Williams

Plaintiff contends that the ALJ also improperly reduced the weight he gave to the opinion of Dr. Williams, who treated plaintiff for a variety of conditions from 6 November 2007 to 3 December 2008. *See* Tr. 764-810. On 12 June 2008, Dr. Williams wrote a letter in support of plaintiff's disability claim in which she stated that plaintiff "has hypertension, severe back pain and sciatica. An MRI has revealed herniated discs. She is in constant severe pain and cannot work." Tr. 860. In his decision, the ALJ addressed this opinion as follows:

> Less weight is given to Dr. Williams, who stated she believed that the claimant could not work. Her opinions appear to be based on subjective reports from the

claimant, rather than objective findings. Dr. Williams' opinions are inconsistent with the record as a whole and are not supported by appropriate objective findings.

Tr. 947 ¶ 5.

As with Dr. Roberson's opinions, plaintiff again objects to the ALJ's treatment of this opinion on the grounds that it is based on plaintiff's subjective complaints rather than objective evidence, especially given that Dr. Williams "explicitly refers to [plaintiff's] MRI of the lumber spine." (Plf.'s Mem. 17). But, as discussed above, the record does not contain an MRI or other objective medical evidence showing that plaintiff has, or was ever diagnosed with, herniated discs. The court accordingly concludes that the ALJ's assessment of Dr. Williams' opinion is supported by substantial evidence and is otherwise proper.

### D. Medical Opinion of Dr. Solovieff

Plaintiff next contends that the ALJ improperly assessed the opinion of state examining consultant, Dr. Solovieff, who conducted a physical examination of plaintiff on 2 March 2010. Tr. 1525-31. The ALJ gave this opinion "some weight due to being generally consistent with the record as a whole, but [found] somewhat different limitations to be supported by the record." Tr. 950. Plaintiff contends that the ALJ misevaluated Dr. Solovieff's opinion regarding plaintiff's grip strength and need for a cane. (Plf.'s Mem. 19).

Regarding plaintiff's grip strength, Dr. Solovieff stated that it "was decreased bilaterally, but was clinically adequate for light work." Tr. 1530. In his decision, the ALJ described this finding as follows: "[Dr. Solovieff] wrote that [plaintiff's] grip strength was decreased bilaterally and she had limited motion, but her abilities were clinically adequate for light work." Tr. 950. Plaintiff asserts that the ALJ's restatement of the grip strength finding indicates that the ALJ believed that Dr. Solovieff's light work finding applied to plaintiff's other limitations.

To the extent that the ALJ did interpret Dr. Solovieff's finding as plaintiff contends, the court finds that the ALJ was acting within the scope of his authority to interpret and resolve ambiguities in the evidence. In any event, Dr. Solovieff's report contains other findings that would indicate that plaintiff is capable of light work, as the ALJ ultimately found. For example, Dr. Solovieff found that "[d]uring [his] evaluation, [plaintiff] demonstrated ability to sit, stand, move about, handle objects, hear, speak and travel." Tr. 1529. He also found that she could stand on her toes and that her overall muscle strength was 5/5. Tr. 1529. Notably, plaintiff has not challenged the ALJ's RFC determination, which finds plaintiff capable of light work subject to various limitations. Accordingly, the court finds this argument by plaintiff to be without merit.

Plaintiff's asserts that the ALJ rejected an apparent finding by Dr. Solovieff that plaintiff required the use of a cane to walk. This contention is equally without merit because Dr. Solovieff did not make such a finding. In fact, it appears that he found to the contrary, noting in his neurologic examination findings that "[s]he walks slowly and *carries* a cane in her right hand, *but does not use it to bear weight*." Tr. 1529 (emphasis added). In his report summary, Dr. Solovieff further stated that "[s]he had a slow gait and walked with a cane, which she said she used always. She *carries* a cane in her right hand and was *noted to not be bearing weight on the cane as she walked*." Tr. 1529 (emphasis added). The court concludes that the ALJ's assessment of Dr. Solovieff's opinion was proper.

E.    **Medical Opinion of Dr. Huryn**

Plaintiff next argues that the ALJ improperly discounted the 10 April 2010 opinion of psychologist Dr. Huryn (Tr. 1590-91), who treated plaintiff from December 2009 to May 2010 (Tr. 1592-1618). The ALJ described Dr. Huryn's opinion as follows:

On April 14, 2010, Dr. Huryn completed a medical source statement and opined that the claimant had mild restriction of activities of daily living, marked difficulties in maintaining social functioning, and that deficiencies in concentration, persistence, or pace were present. However, she noted that repeated episodes of decompensation were absent and that the complete inability to function independently outside the area of her home was also absent. The work-related psychiatric limitations she noted were that the claimant was only moderately impaired in the ability to carry out detailed instructions and the ability to work in coordination with and proximity to others without being distracted by them. Further, she was only moderately impaired in the ability to complete a normal workweek at a consistent pace without psychiatric interruptions, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to set realistic goals or make plans independently of others (Ex. 61F).

Tr. 948. The ALJ gave Dr. Huryn's opinion only "limited" weight "because her treatment has largely coincided with a period of grieving over the loss of the claimant's husband that is not reflective of her general mental state from a longitudinal perspective." Tr. 949.

Plaintiff contends that the ALJ erred in determining that Dr. Huryn's finding of marked limitations in social functioning was not consistent with the longitudinal record, which she contends indicates a significant history of difficulty in social functioning. Specifically, plaintiff cites to the statement in Dr. Huryn's opinion that plaintiff "has a long history of being somewhat socially withdrawn & dependent on others due to growth on face & sexual abuse as a child." Tr. 1591. Plaintiff also cites to a summary of treatment by the Community Coalition Against Family Violence ("CCAFV"), which treated plaintiff for depression due to bereavement from 11 December 2009 to 10 June 2010. (*See* Tr. 1617-19).[5] The summary noted that plaintiff has a "lifelong history of social relational problems but can be very resourceful at times." Tr. 1618.

Plaintiff fails to acknowledge, however, that the treatment records from Dr. Huryn and CCAFV were generated in a seven-month period which began approximately two months after the death of plaintiff's husband in October 2009. Moreover, the records indicate that plaintiff

---

[5] Plaintiff incorrectly identifies this record as being that of Dr. Huryn.

initially sought treatment from each of these providers in response to depression symptoms resulting from this loss. *See* Tr. 1608 (record of initial visit with Dr. Huryn noting the purpose of the visit was to "[d]eal with grief from husband's death"); Tr. 1617 (CCAFV treatment summary listing as two of the treatment goals to "[o]vercome depression due to bereavement (death of husband and sister)" and to "[d]eal with anger due to person involved w/ husband's murder").

Further, the record contains, and the ALJ discussed, evidence both before and after this period supporting his conclusion that plaintiff's overall social functioning was less limited than Dr. Huryn found in her opinion. For example, three non-examining state agency mental consultants, one of whom evaluated plaintiff before the death of her husband and two after it, found plaintiff to have no more than moderate limitations in social functioning. *See* Tr. 634 (mild limitations on 23 Jan. 2007); Tr. 1549 (moderate limitations on 25 Mar. 2010); Tr. 1631 (moderate limitations on 7 July 2010). And, as discussed in more detail below, on 16 March 2010, examining state agency consulting psychologist Dr. Strag's assessment evidenced only moderate impairment in social functioning. Tr. 1540. Also, except for one notation regarding insomnia on 11 February 2011 (Tr. 1661), mental examinations performed by Dr. Roberson during plaintiff's office visits between May of 2010 and 13 August 2012 indicate that plaintiff exhibited normal, calm, and appropriate behavior, and intact thought content, processes, and perceptions. *See* Tr. 1680 (10 May 2010); Tr. 1678 (7 June 2010); Tr. 1234 (13 July 2012), Tr. 1237 (13 Aug. 2012). The court finds that this evidence constitutes substantial evidence supporting the ALJ's determination that Dr. Huryn's opinion was entitled to decreased weight because it was not consistent with the longitudinal medial record.

The court further notes that Dr. Huryn's opinion is internally inconsistent regarding the general finding of marked limitations in social functioning. In the section of the opinion listing

20 specific work-related limitations, many of which relate directly to social functioning, Dr. Huryn indicated only moderate or no significant limitations. Tr. 1591. For example, Dr. Huryn indicated no significant impairment in plaintiff's ability to: "interact appropriately with the general public," "accept instructions and respond appropriately to criticism from supervisors," "maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness," and "travel in unfamiliar places or use public transportation." Tr. 1591. Dr. Huryn found only moderate impairment in plaintiff's ability to "work in coordination with and proximity with others without being distracted by them" and "get along with coworkers or peers without distracting them or exhibiting behavioral extremes." Tr. 1591. These detailed findings do not support Dr. Huryn's ultimate conclusion that plaintiff has marked limitations in social functioning. The court concludes that the ALJ's assessment of Dr. Huryn's opinion was proper.

**F.    Dr. Strag**

As with Dr. Huryn, plaintiff also asserts that the ALJ improperly discounted the first of two opinions of examining state agency consulting psychologist Dr. Strag on the grounds that his findings were not consistent with the longitudinal record. The subject opinion was issued on 16 February 2010, approximately four months after the death of plaintiff's husband. Tr. 1346-49. Following his examination, Dr. Strag diagnosed plaintiff with: major depression, recurrent-type; acute posttraumatic stress disorder due to the death of her husband; and borderline intellectual functioning. Tr. 1348-49. He also found her to exhibit "psychosocial stress of having lost her companion and her husband, bereavement is delayed," and assigned her a GAF (*i.e.*, Global Assessment of Functioning) score of 45, which is consistent with serious impairment in social

functioning.[6]  Tr. 1349.  He stated that plaintiff was "in need of supportive psychotherapy and the medication to control her depressive symptoms."  Tr. 1349.

The ALJ gave Dr. Strag's findings only "some" weight "because they overstate the level of [the claimant's] impairment" and because the GAF of 45 was "inconsistent with the record as a whole."  Tr. 949.  The ALJ further explained that Dr. Strag's opinion is "very subjective, reflects intermittent problems, and lacks longitudinal perspective.  For instance, it is in part based

---

[6]  The GAF scale measures a person's overall psychological, social, and occupational functioning. Am. Psych. Assn., *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. text rev. 2000) ("DSM–IV–TR"). Selected GAF scores have the following meanings:

> 90-81 Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members).

> 80-71 If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork).

> 70-61 Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

> 60-51 Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

> 50-41 Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

> 40-31 Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

> 30-21 Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

DSM–IV–TR 34.

on the claimant's understandable reaction to the loss of her husband, but that grief does not reflect her long-term abilities (Ex. 52F)." Tr. 949.

Because Dr. Strag's first opinion was issued approximately four months after the death of plaintiff's husband, the court concludes, for the same reasons discussed with respect to Dr. Huryn's opinion, that substantial evidence supports the ALJ's reduction in the weight he gave to it. A second opinion by Dr. Strag issued on 16 March 2010 (Tr. 1538-40)—which plaintiff does not challenge—provides further support for the ALJ's assessment of Dr. Strag's first opinion.

Dr. Strag's second opinion was issued following his administration of an IQ test to plaintiff and performance of a mental status examination of her. Tr. 1538-40. He found plaintiff to have a full-scale IQ of 56, but also noted that the "[e]ffort [plaintiff] put forth on the examination appeared to be minimal" and that her "interest in participating in the examination was poor." Tr. 1539. He further found that she "present[ed] with evidence of cognitive deficits in all areas with the exception of short-term memory function," had "[p]rocessing speed [that] was significantly below expectation," and an overall level of functioning "well below expectation." Tr. 1539. He changed his earlier diagnosis from borderline intellectual functioning to mild mental retardation and assigned her a GAF of 55 (Tr. 1540), which is consistent with moderate impairment in social functioning. *See* DSM-IV-TR 34.

The ALJ assigned only some weight to this opinion explaining:

Again, the findings and opinions of Dr. Strag are given only some weight because the claimant's low IQ score is particularly suspicious given her lack of effort and Dr. Huryn's statement that the claimant was intellectually above average (Ex. 62F). Moreover, Dr. Strag assessed a higher GAF score in the moderate range, which tends to support the undersigned's finding with respect to the "paragraph B" criteria [which includes a finding of moderate limitations in social functioning].

Tr. 950.

This second opinion supports the ALJ's assessment of the first opinion because it shows an improvement in plaintiff's level of social functioning one month later, as indicated by Dr. Strag's assignment of a higher GAF of 55. Tr. 1540. That score is consistent with moderate impairment in social functioning (*see* DSM-IV-TR 34), as opposed to serious impairment indicated by the score of 45. The court concludes that the ALJ's assessment of Dr. Strag's 16 February 2010 opinion was proper.

## III. THE ALJ'S CONSIDERATION OF THE MEDICAID DECISION

Plaintiff next contends that the ALJ improperly discounted the 25 October 2007 Medicaid decision finding that she was disabled for the purposes of Medicaid. An ALJ is required to consider decisions by other governmental agencies about whether a claimant is disabled, including Medicaid decisions, although such decisions are not binding on the ALJ. *See* Soc. Sec. Ruling 06-03p, 2006 WL 2329939, at *6-7 (9 Aug. 2006) ("[E]vidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered."). "These decisions, and the evidence used to make these decisions, may provide insight into the individual's mental and physical impairment(s) and show the degree of disability determined by these agencies based on their rules." *Id.* at *7. Failure to discuss a Medicaid decision can require remand. *Davis v. Astrue*, No. 7:10-CV-00231-D, 2012 WL 555782, at *5 (E.D.N.C. 5 Jan. 2012) ("In the present case, the ALJ not only failed to explain the consideration given, but completely failed to even acknowledge the NCDHHS decision. In such cases, this Court has determined that remand is necessary to allow the ALJ to consider the NCDHHS decision and explain its consideration in the ALJ's analysis."), *mem. & recomm. adopted by* 2012 WL 555304, at *1 (E.D.N.C. 17 Feb 2012); *Walton v. Astrue*, No. 7:09–CV–112–D, 2010 WL 2772498, at *1 (E.D.N.C. 9 July 2010) (remanding for further consideration where "the ALJ

said nothing [regarding the NCDHHS decision], and SSR–06–3p requires more than 'nothing'");

*Bridgeman v. Astrue*, No. 4:07–CV–81–D, 2008 WL 1803619, at *1, *10 (E.D.N.C. 21 Apr. 2008) (remanding for further explanation where ALJ mentioned Medicaid ruling, but dismissed its relevance without discussion).

After expressly acknowledging his obligation to consider the Medicaid decision, the ALJ gave the decision only "minimal" weight, explaining as follows:

> Because the decision at issue is worded in vague, general, and conclusory terms and does not cite or recount the evidence used to reach the decision, the undersigned finds that it provides little insight into the claimant's impairments. The undersigned cannot tell what medical or vocational evidence was used to reach the conclusion of disability or whether said evidence was similar to, or different from, the evidence of record before the undersigned. As such, the decision of the Hearing Officer as it appears in the record is little more than opinion evidence from a non-medical source that the claimant is disabled. . . . [Factors weighing against the opinion] are: the Hearing Officer has had only minimal contact with the claimant; the Hearing Officer's opinion is not well supported or well explained; and the Hearing Officer's opinion is not consistent with the other evidence of record.

Tr. 951.

Plaintiff argues that the ALJ improperly discounted this decision given that it "explicitly notes the evidence considered, including the treating physician opinion (Dr. Williams) and the MRI." (Plf.'s Mem. 20). The court disagrees.

The hearing officer's only reference to the medical evidence upon which he relied consisted of the following:

> [Plaintiff] submitted written argument and additional medical evidence on June 16, 2008. Additional medical evidence was submitted in the form of a letter from [plaintiff's] treating physician. The medical evidence shows that [plaintiff] is severely limited by severe back pain and sciatica. An MRI has revealed that [Plaintiff] has herniated discs.

Tr. 197. The ALJ properly concluded that this minimal discussion of the evidence by the hearing officer provided essentially nothing additional or helpful for the ALJ to consider beyond the

record already before him.  Moreover, the sole piece of objective medical evidence referenced by the hearing officer is the elusive MRI purportedly showing plaintiff to have herniated discs.  As discussed repeatedly above, the record contains no such evidence, thereby supporting the ALJ's determination that the Medicaid decision was not supported by the medical evidence of record.  Accordingly, the plaintiff's argument is without merit and should be rejected.

## IV.    ALJ'S DETERMINATION REGARDING LISTINGS 12.04 AND 12.06

Finally, plaintiff challenges the ALJ's determination that her impairments do not meet or medically equal the listings for affective disorders (Listing 12.04) or anxiety related disorders (Listing 12.06).  The court disagrees.

The Listings consist of impairments, organized by major body systems, that are deemed sufficiently severe to prevent a person from doing any gainful activity.  20 C.F.R. §§ 404.1525(a), 416.925(a).  Therefore, if a claimant's impairments meet a listing, that fact alone establishes that the claimant is disabled.  *Id*. §§ 404.1520(d), 416.920(d).  An impairment meets a listing if it satisfies all the specified medical criteria.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); Soc. Sec. R. 83-19, 1983 WL 31248, at *2 (1983).  The burden of demonstrating that an impairment meets a listing rests on the claimant.  *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

Even if an impairment does not meet the listing criteria, it can still be deemed to satisfy the listing if the impairment medically equals the criteria.  20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5).  To establish such medical equivalence, a claimant must present medical findings equal in severity to all the criteria for that listing.  *Sullivan*, 493 U.S. at 531; 20 C.F.R. §§ 404.1526(a) (medical findings must be at least equal in severity and duration to the listed criteria), 416.926(a) (same).  "A claimant cannot qualify for benefits under the 'equivalence' step

by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531.

Listing 12.04 is met or equaled by satisfying the paragraph A and B criteria, or the paragraph C criteria.[7] Listing 12.06 is met or equaled by satisfying the paragraph A and B criteria, or the paragraph A and C criteria.[8] The ALJ did not explicitly address the paragraph A criteria of either listing. Instead, he found that plaintiff did not meet or equal either listing for failure to satisfy the paragraph B and C criteria.

In her memorandum, plaintiff did not expressly challenge the ALJ's paragraph C determination with respect to either listing. She does, however, argue that she satisfies the paragraph B criteria, although she does not identify clearly the specific functional areas in which she claims she has the requisite degree of limitation. More broadly, she argues that the ALJ failed adequately to explain his listing determination by "referencing no evidence in the record except for a couple of distorted statements from a few 'reports of contact'" and not revealing the reasoning underlying his analysis. (Pl.'s Mem. 21). Plaintiff's arguments are baseless.

The paragraph B criteria, which are, of course, the same for both listings, are satisfied by a showing that the claimant's mental impairments at issue result in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or

---

[7] In Listing 12.04, the paragraph A criteria require medically documented persistence of depressive syndrome, manic syndrome, or bipolar syndrome, each meeting various requirements, and the paragraph C criteria a medically documented history of a chronic affective disorder of at least two years' duration, again meeting various requirements. Listing 12.04A, C.

[8] In Listing 12.06, the paragraph A criteria require, subject to additional specific requirements, medically documented findings of generalized persistent anxiety, a persistent irrational fear, recurrent severe panic attacks, recurrent obsessions or compulsions, or recurrent and intrusive recollections of a traumatic experience. Listing 12.06A. The paragraph C criteria require the complete inability to function outside the area of one's home as a result of a condition in paragraph A. Listing 12.06C.

4. Repeated episodes of decompensation, each of extended duration[.][9]

Listings 12.04B, 12.06B. At step three, the ALJ found plaintiff to have moderate difficulties in activities of daily living, social functioning, and concentration, persistence, and pace; and no episodes of decompensation of extended duration. Tr. 938-39 ¶ 4. The ALJ explained his determination on the paragraph B criteria as follows:

> Based upon the evidence discussed in greater detail under Finding #5 [RFC determination], the undersigned makes the following findings with respect to the "paragraph B" criteria:
>
> In activities of daily living, the claimant has moderate restriction. The claimant has described needing a home health aide, but testimony and other evidence from during the period in question shows that she could still cook, clean, drive, and grocery shop (Ex. 15E, 16E) [reports of contact]. These factors are consistent with any restriction in activities of daily living being no greater than moderate. This finding is consistent with the most recent State agency mental consultant (Ex. 64F).
>
> In social functioning, the claimant has moderate difficulties. Although the claimant testified to living alone and being self-conscious due to her hemangioma, other evidence reflects she was able to live with her daughter and her daughter's children while her daughter was getting ready to have another child. These factors are consistent with any difficulties in social functioning being no greater than moderate (Ex. 44F). This finding is also consistent with the most recent State agency mental consultant (Ex. 64F).
>
> With regard to concentration, persistence, or pace, the claimant has moderate difficulties. The claimant has described problems with concentrating, but she has also described the ability to watch television and testimony and other evidence shows she could still cook, clean, drive, and grocery shop during the period in question (Ex. 15E, 16E). These factors are consistent with any difficulties in concentration, persistence, or pace being no greater than moderate. This finding is also consistent with the most recent State agency mental consultant [John J. Parsley, Psy.D.] (Ex. 64 F).
>
> As for episodes of decompensation, the record shows the claimant has experienced no episodes of decompensation, which have been of extended

---

[9] For the first three functional areas, the ratings, in order of increasing level of limitation, are none, mild, moderate, marked, and extreme. *See* 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4); Listing 12.00C1-3. The last area—repeated episodes of decompensation, each of extended duration—means three episodes within one year or an average of one every four months, each lasting at least two weeks. *See* Listing 12.00C4.

duration. This finding is also consistent with the most recent State agency mental consultant (Ex. 64 F).

Tr. 938-39 ¶ 4.

This discussion, alone, demonstrates that the ALJ relied on more than the reports of contact—Exhibits 15E and 16E—as plaintiff asserts. As indicated, the ALJ also referenced the 7 July 2010 report of Dr. Parsley, whose findings on the paragraph B criteria were the same as the ALJ's. Tr. 1631.

More significantly, the ALJ stated at the start of his analysis of the paragraph B criteria that it was "[b]ased upon the evidence discussed in greater detail under Finding #5," his RFC determination. Tr. 938 ¶ 4. The fact that the reasons underlying an ALJ's listing determination are not all set out at step three of the sequential analysis does not constitute legal error where the decision read as a whole makes them clear. *See, e.g., Smith v. Astrue*, No. 11-1574, 2011 WL 6188731, at *1 (4th Cir. 14 Dec. 2011); *Lydia v. Astrue*, No. 2:11-1453-DCN-BHH, 2012 WL 3304107, at *5 (D.S.C. 25 Jul. 2012) ("This sort of deconstruction of the ALJ's decision[ ] is not useful. The ALJ's decision must be read as a whole."), *report & recomm. adopted by* 2012 WL 3308108, at *1 (13 Aug. 2012); *Finley v. Astrue*, No. 5:08-CV-209-D(l), 2009 WL 2489264, at *5 (E.D.N.C.) ("[T]he ALJ's decision may appropriately be read 'as a whole.'" (quoting *Jones v. Barnhart*, 364 F.3d 501, 504-05 (3rd Cir. 2004))), *mem. & recomm. accepted by* 2009 WL 2489264, at *1 (13 Aug. 2009).

In his RFC analysis, the ALJ discussed the records of all providers that treated plaintiff for mental health impairments. *See, generally,* Tr. 946-52 ¶ 5. In addition to the records of Dr. Huryn and CCFAV addressed above, he discussed the treatment records of Port Human Services (Tr. 523-61), which treated plaintiff for depression from 30 August 2006 to 24 October 2006. The ALJ stated:

She reported mental abuse by her husband, who was also possessive. However, out of 7 years of marriage, they only lived together a year in total. She worked as a CNA for 3 years, but had not worked since January 2006. She was fired from two positions due to conflict with management. Her insight and judgment were average. Motor activity was unremarkable, but she reported her sleep pattern and appetite were poor. Her affect was depressed. Her symptoms of depressive-like behavior were fatigue, poor concentration, sadness, withdrawn, crying, feelings of helpless/hopeless, and feelings of worthlessness. Her thinking was unremarkable and her attitude was passive. The impression was major depression. On September 6, 2006, the claimant's chief complaint was depression. On physical exam, she was well-developed, well-nourished, alert, and fully oriented. Her attention span was adequate for the interview. She was not distractible and had no impairment of her attention. Both short and long-term memory functions were intact. There was no evidence of tenseness, restlessness, or fidgeting. She denied suicidal or homicidal ideation, as well as hallucination. Her thought processes were logical, sequential, coherent, and relevant without evidence of flight of ideas or looseness of association. Her insight was good with regard to her illness and how it affected her daily life. Her judgment was also good. Her mood was depressed and affect was flat. She was not angry, hostile, euphoric or elated. There were no neologisms, preservations, echolalia or confabulations. Cognitive function appeared to be consistent with age and education level. She appeared to think and function on a concrete level. She was to start on an antidepressant and something to help stop the racing thoughts, which caused difficulty with sleep. The diagnoses were depression and post-traumatic stress disorder. She was given a prescription for Cymbalta and Seroquel (Ex. 17F). [The] records . . . reflected a GAF score of 40 on that day (Ex. 19F).

Tr. 946-47.

In addition to the medical opinion of Dr. Parsley, the ALJ also discussed the medical opinions of all the other state agency mental consultants, including Banu Krishnamurthy, M.D. (Tr. 620-37 (23 Jan. 2007)), W. H. Perkins, Ph.D. (Tr. 672 (28 Mar. 2007)), and W.W. Albertson, Ed.D. (Tr. 1549-50 (25 Mar. 2010)). Significantly, he noted that "[o]verall, no mental consultant found greater than moderate restriction in the so-called 'paragraph B' criteria," and further explained as follows:

The mental consultants concluded the claimant could understand and remember short and simple instructions, maintain attention and concentration for 2 hours at a time, interact appropriate with peers and supervisors, and adapt to change in a work setting, consistent with performing simple, routine, repetitive tasks (SRRTs). Dr. Albertson added the claimant would have some trouble accepting

instructions and responding appropriately to criticism from supervisors, as well as interacting appropriately with others, so she ought not to work with the public, but could handle a low stress work environment. Dr. Parsley (2010) concurred with Dr. Albertson's additional provisos, noting the need for a low stress, low social demand, non-fast paced work setting involving "SRRTs."

Tr. 952. Moreover, the ALJ again discussed the report of contact from plaintiff's daughter, noting specifically the daughter's statement that she "had not noticed [plaintiff to have] any memory or concentration problems, or problems understanding and following instructions," but that she had observed that plaintiff "did not handle stress well, especially after the passing of her late husband." Tr. 952.

The ALJ's discussion of these records in his RFC analysis further clarifies and supports the reasons underlying his paragraph B criteria findings at step three. Accordingly, the court concludes that plaintiff's argument that the ALJ disregarded or failed to adequately discuss the medical evidence in support of his findings that plaintiff did not meet or medically equal Listings 12.04 and 12.06 is wholly without merit. It should accordingly be rejected.

Finally, in support of her brief argument that she meets the paragraph B criteria, plaintiff cites to Dr. Strag's assessment of a GAF of 45 on 14 February 2010 (Tr. 1349); Dr. Huryn's 19 January 2010 statement that plaintiff had poor concentration, attention, and recent memory (Tr. 1614-15); Dr. Huryn's 14 April 2010 opinion that plaintiff had marked limitations in social functioning and deficiencies in concentration, persistence, or pace that result in a frequent interfering with the ability to timely completely tasks (Tr. 1590-91); and the discussion of the "long-term nature of plaintiff's social problems" in the treatment summary from CCAFV (Tr. 1618). This particular evidence, though, which the ALJ clearly appears to have considered, does not negate the ALJ's assessment based on the record as a whole that plaintiff does not satisfy the paragraph B criteria. At bottom, plaintiff's argument amounts to no more than an invitation for

this court to reweigh the evidence with respect to the ALJ's findings and come to a different conclusion. Under the applicable standard of review, the court is not permitted to do so. *See Craig*, 76 F.3d at 589. Thus, this aspect of plaintiff's challenge to the ALJ's listing determination also fails, and the challenge should be rejected in its entirety.

## CONCLUSION

After careful consideration of the ALJ's decision and the record in this case, the court concludes that the decision is supported by substantial evidence of record and based on proper legal standards. IT IS THEREFORE RECOMMENDED that the Commissioner's motion (D.E. 34) for judgment on the pleadings be ALLOWED, plaintiff's motion (D.E. 30) for judgment on the pleadings be DENIED, and the final decision of the Commissioner be AFFIRMED.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who shall have until 27 January 2015 to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. Any response to objections shall be filed within 14 days after service of the objections on the responding party.

This, the 13th day of January 2015.

James E. Gates
United States Magistrate Judge